UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:10 CR 255 CDP FRB |
| | ) | |
| DAVID PEER, | ) | |
| ADAM OLIVKOVICH, and | ) | |
| MOSHE AHARONI, | ) | |
| | ) | |
| Defendants. | ) | |

SUPERSEDING INDICTMENT

COUNT I
Conspiracy To Commit Mail and Wire Fraud

The Grand Jury charges that:

A. **Introduction.**

At times relevant to this indictment:

1. Dependable Locks, Inc., ("Dependable Locks") was a New York corporation headquartered at 407 South Arcturas, Clearwater, Florida. Dependable Locks was owned and operated by defendants David Peer, Adam Olivkovich, and others.

2. Y.Y. Call Center, LLC, ("Y.Y. Call Center") was a business entity operating from 407 South Arcturas, Clearwater, Florida. Y.Y. Call Center was owned and operated by defendants David Peer, Adam Olivkovich, and others.

3. Defendant David Peer held himself out as President of Dependable Locks and directed the call center and dispatch operations of Dependable Locks and Y.Y. Call Center from the location at 407 South Arcturas in Clearwater, Florida.

1

4. Defendant Adam Olivkovich managed and directed locksmith technicians operating throughout the United States, including in the Eastern District of Missouri. These locksmith technicians were employed and dispatched by Dependable Locks, under the direction of David Peer and others.

5. Defendant Moshe Aharoni was employed as a dispatch supervisor by Dependable Locks and Y.Y. Call Center at the 407 South Arcturas location in Clearwater, Florida. He operated under the supervision of defendant David Peer.

6. Beginning on or about January 31, 2006, and continuing to on or about November 4, 2009, defendants David Peer, Adam Olivkovich, Moshe Aharoni, and others known and unknown, operating through the entities Dependable Locks and Y.Y. Call Center, operated a locksmith business that included both a call center and a nationwide network of locksmith technicians who responded to emergency lockout requests, typically from consumers who had accidentally locked themselves out of a residence or automobile.

7. The defendants employed dozens of locksmith technicians, who operated under the defendants' direction and control in major metropolitan centers throughout the United States. The defendants employed locksmith technicians operating in the State of Missouri, including the Eastern District of Missouri.

8. The defendants maintained a full-time staff of telephone operators and locksmith dispatchers, on duty 24 hours per day, who operated from 407 South Arcturas, Clearwater, Florida, under the management and control of defendant David Peer and others.

9. The call center operators received phone calls, which were electronically forwarded to the call center at 407 South Arcturas, Clearwater, Florida, from a large number of telephone numbers listed nationwide for emergency locksmith services. The operators received the calls

2

and the defendants' locksmith business dispatched a locksmith technician from the area of each call to respond.

10. Unindicted co-conspirators E.B., Y.S., and Y.A. were locksmith technicians employed by defendants David Peer and Adam Olivkovich, through Dependable Locks, in the State of Missouri at various times between 2006 and 2009. E.B. and Y.S. provided locksmith services under the direction and control of the defendants in the Eastern District of Missouri. At certain times that they worked as locksmith technicians for Dependable Locks, E.B., Y.S., and Y.A. were aliens who were residing illegally in the United States and were unauthorized to work as locksmith technicians in the United States.

### B.     Conspiracy To Commit Mail and Wire Fraud.

11. Between on or about January 31, 2006, and November 4, 2009, in the Eastern District of Missouri, and elsewhere,

**DAVID PEER,
ADAM OLIVKOVICH, and
MOSHE AHARONI,**

Defendants herein, did knowingly and intentionally conspire, combine, confederate and agree, with each other and with other persons, both known and unknown to the Grand Jury, to commit offenses against the United States, to wit: (1) having devised a scheme and artifice to defraud, and for the purpose of obtaining money or property by means of false and fraudulent pretenses, representations, and promises, to execute said scheme and artifice to defraud by knowingly causing parcels to be delivered by the United States Postal Service and interstate commercial carrier, in violation of Title 18, United States Code, Section 1341; and (2) to execute said scheme and artifice to defraud by knowingly causing writings, signs, signals, and sounds to be

3

transmitted by means of wire communication in interstate commerce, in violation of Title 18, United States Code, Section 1343.

### C. Manner and Means of the Conspiracy.

The objects of the conspiracy were pursued in the following manner and through the following means:

12. It was part of the conspiracy that defendants David Peer, Adam Olivkovich, Moshe Aharoni, and others known and unknown, knowingly and intentionally devised and implemented a scheme and artifice to defraud customers of locksmith services, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises. Among other things, this scheme and artifice included fraudulent and deceptive advertising practices, designed to procure locksmith-service business from customers under false and misleading pretenses. It also included fraudulent and deceptive price-quoting practices, designed to mislead customers of locksmith services about the prices charged by the locksmith technicians. At various times during the life of the conspiracy, this scheme and artifice to defraud included but was not limited to the following elements:

    a. It was part of this scheme and artifice that the defendants' locksmith business operated under numerous fictitious business names across the United States, including in the State of Missouri and the Eastern District of Missouri. These fictitious business names were advertised and listed in various media and directories, such as Yellow Pages, Yellowbook, and the internet.

    b. It was further part of this scheme and artifice that certain fictitious business names for the defendants' locksmith business were advertised in media and listed in phone directories with local phone numbers. Certain advertisements and directory listings also

4

contained false and fraudulent local business addresses for the defendants' locksmith business. These addresses were real local addresses, but they were in fact the addresses of other local business or residential properties with no affiliation with the defendants. Said advertisements and listings were designed to deceive locksmith customers who responded to them into believing that they were contacting a local business.

  c. It was further part of this scheme and artifice that the local phone numbers in the advertisements and directory listings for the defendants' locksmith business were routed automatically to the call center at 407 South Arcturas in Clearwater, Florida, by interstate wire transmission.

  d. It was further part of this scheme and artifice that operators at the Florida call center were trained and instructed to answer the phone using a fictitious local business name that falsely identified the company to the customer as a local business.

  e. It was further part of this scheme and artifice that, for emergency lockout customers, the operators were trained to avoid giving a price quote to the customer. Consistent with their training, the operators typically provided three differently phrased reasons to refuse to give pricing information, in lieu of giving a price quote.

  f. It was further part of this scheme and artifice that, if a customer insisted three times on receiving a price estimate, operators were trained to state that the price for a lockout would be a "$39 service fee, plus $15 and up to open the door." This price quote was deliberately crafted by the defendants to mislead customers into expecting that they would be charged only $54. Operators were instructed to avoid revealing the maximum price for emergency lockout services, which was, at various times, $149 or $179.

5

g. It was further part of this scheme and artifice that certain customers were not told the phrase "and up" at all, but were quoted a fixed service fee, or a fixed fee for service and opening, and were then charged more than the quoted price by the responding locksmith.

h. It was further part of this scheme and artifice that the price quote of $54 was fraudulently designed by David Peer and others to be realistic yet slightly below market rates for emergency lockout services, so as to mislead customers into believing that they would be charged a competitive price for emergency lockout services.

i. It was further part of this scheme and artifice that the actual price charged for lockout services was seldom $54. Rather, the defendants and their agents trained, encouraged, and pressured the locksmith technicians to charge prices above $54 for emergency lockouts, up to $149 or $179, regardless of the services required to open the customer's lock.

j. It was further part of this scheme and artifice that operators and locksmith technicians were instructed to make, and commonly did make, fraudulent representations about the expected response time of the locksmith technicians.

k. It was further part of this scheme and artifice that operators were instructed to tell and generally did tell customers that their technicians were "professionally trained, certified, licensed locksmiths," when in fact, as defendants knew, many of their technicians had only cursory locksmith training, and many technicians were illegal aliens without authorization to work in the United States.

l. It was further part of this scheme and artifice that, in the case of price disputes with customers, Dependable Locks technicians were instructed to engage, and often did engage, in coercive pressure tactics to procure payment from customers. For example, on certain occasions, locksmith technicians withheld identification from customers who refused to pay,

6

threatened to call the police and have customers arrested for "theft of services," threatened to lock customers' keys back in the car or home, and followed customers to ATMs to ensure cash payment.

m. It was further part of this scheme and artifice that, on certain occasions, locksmith technicians were encouraged to drill locks unnecessarily and destroy them, so that the defendants and others could profit from charges for replacement locks.

n. It was further part of this scheme and artifice that the defendants collected millions of dollars in fraudulently induced charges from customers of their locksmith services.

o. It was further part of this scheme and artifice that locksmith technicians split the proceeds of the locksmith jobs with Dependable Locks. The defendants caused their locksmiths to send weekly shipments of receipts, cash, and checks by the U.S. Postal Service and interstate commercial carrier, from locations outside Florida to 407 South Arcturas, Clearwater, Florida.

13. It was further part of the conspiracy that the defendants knowingly caused numerous interstate wire communications, including telephone calls and email communications, and knowingly caused the interstate shipment of numerous parcels by the United States Postal Service and interstate commercial carrier, to further their scheme to defraud.

14. It was further part of the conspiracy that David Peer, Adam Olivkovich, Moshe Aharoni, and others known and unknown, implemented the aforesaid scheme and artifice to defraud by engaging in a pattern and practice of hiring aliens who were unauthorized to work in the United States, to serve as locksmith technicians.

15. It was further part of the conspiracy that the defendants took steps to conceal the illegal alien status of their locksmith technicians, including but not limited to: failing to collect

7

Employment Eligibility Verification Forms ("I-9") from technicians, falsely claiming that technicians were "independent contractors" to avoid reporting them as employees, moving or reassigning a technician to avoid immigration problems, preventing the actual calling of police in cases of price disputes, and refusing to dispatch illegal technicians to military bases.

### D. Overt Acts.

16. In furtherance of this conspiracy and to effect the objects thereof, the defendants knowingly committed and caused to be committed numerous overt acts in the Eastern District of Missouri and elsewhere, including but not limited to the following acts committed by the defendants' co-conspirators:

A. On or about February 22, 2008, in the Eastern District of Missouri, the defendants caused Y.S., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer, M.F., and to charge that customer more than he or she had been misled to expect by Dependable Locks operators.

B. On or about April 17, 2008, in the Eastern District of Missouri, the defendants caused E.B., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer, M.F., and to charge that customer more than he or she had been misled to expect by Dependable Locks operators.

C. On or about January 28, 2009, in the Eastern District of Missouri, the defendants caused Y.S., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer, K.S., and to charge that customer more than he or she had been misled to expect by Dependable Locks operators.

D. On or about January 29, 2009, in the Eastern District of Missouri, the defendants caused Y.S., a locksmith technician employed by Dependable Locks, to provide

locksmith services to a customer, J.O., and to charge that customer more than he or she had been misled to expect by Dependable Locks operators.

E. On or about February 24, 2009, in the Eastern District of Missouri, the defendants caused E.B., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer, K.S., and to charge that customer more than he or she had been misled to expect by Dependable Locks operators.

F. On or about April 6, 2009, in the Eastern District of Missouri, the defendants caused E.B., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer, N.G., and to charge that customer more than he or she had been misled to expect by Dependable Locks operators.

All in violation of Title 18, United States Code, Section 371.

## COUNTS II-VI
**Mail Fraud**

The Grand Jury further charges that:

17. Paragraphs 1 through 16 of Count I this Indictment are realleged and incorporated by reference herein.

18. On the dates indicated below, in the Eastern District of Missouri, and elsewhere,

**DAVID PEER and
ADAM OLIVKOVICH,**

Defendants herein, having devised the aforesaid scheme and artifice to defraud, and to obtain money or property by means of false and fraudulent pretenses, representations, and promises, as more fully described in Paragraph 12 of Count I of this Indictment, for the purpose of executing this scheme, did knowingly cause to be delivered by United States mail the following parcels:

9

**Count II:** On or about May 11, 2009, Express Mail parcel number EM321791339US, shipped from the United States Post Office for zip code 63132, located in the Eastern District of Missouri, to 407 South Arcturas, Clearwater, Florida 33765.

**Count III:** On or about May 18, 2009, Express Mail parcel number EH869958527US, shipped from the United States Post Office for zip code 63117, located in the Eastern District of Missouri, to 407 South Arcturas, Clearwater, Florida 33765.

**Count IV:** On or about May 26, 2009, Express Mail parcel number EM321793330US, shipped from the United States Post Office for zip code 63132, located in the Eastern District of Missouri, to 407 South Arcturas, Clearwater, Florida 33765.

**Count V:** On or about June 15, 2009, Express Mail parcel number EH523681711US, shipped from the United States Post Office for zip code 63141, located in the Eastern District of Missouri, to 407 South Arcturas, Clearwater, Florida 33765.

**Count VI:** On or about June 22, 2009, Express Mail parcel number EH523687820US, shipped from the United States Post Office for zip code 63141, located in the Eastern District of Missouri, to 407 South Arcturas, Clearwater, Florida 33765.

All in violation of Title 18, United States Code, Section 1341.

## COUNT VII
### Conspiracy To Harbor Illegal Aliens

19. Paragraphs 1 through 18 of this Indictment are realleged and incorporated by reference herein.

20. Between on or about January 31, 2006, and on or about November 4, 2009, in the Eastern District of Missouri, and elsewhere,

**DAVID PEER,
ADAM OLIVKOVICH, and
MOSHE AHARONI,**

10

Defendants herein, did knowingly and intentionally conspire, combine, confederate and agree, with each other and with other person(s), both known and unknown to the Grand Jury, to commit offenses against the United States, to wit: to conceal, harbor, and shield from detection aliens in certain places in the United States, knowing and in reckless disregard of the fact that those aliens came to, entered, and remained in the United States in violation of the law, for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

### A.  Manner and Means of the Conspiracy.

21. It was part of this conspiracy that the defendants David Peer, Adam Olivkovich, and others recruited, hired, and employed as locksmith technicians, numerous aliens who were illegally residing in the United States and unauthorized to work in the United States.

22. It was further part of the conspiracy that the defendants David Peer, Adam Olivkovich, Moshe Aharoni, and others knew and recklessly disregarded the illegal and unauthorized status of the aliens employed by them and under their direction.

23. It was further part of the conspiracy that the defendants collected forms from the locksmith technicians requiring them to report their visa status, which alerted the defendants to the illegal and unauthorized status of the technicians.

24. It was further part of the conspiracy that the defendants failed to collect, or retain for inspection by authorized government officials, Employment Eligibility Verification ("I-9") Forms from the locksmith technicians employed by them.

25. It was further part of the conspiracy that the defendants harbored the illegal and unauthorized alien technicians by providing them with employment and income, allowing them the means to remain illegally in the United States.

11

26. It was further part of the conspiracy that the defendants dispatched the illegal and unauthorized alien technicians to locksmith jobs throughout the United States, in order to profit from the labor of the illegally employed technicians.

27. It was further part of the conspiracy that the defendants concealed the illegal status of the technicians by arranging to pay the technicians through the direct splitting of cash and check proceeds from locksmith jobs, which enabled them to avoid reporting the locksmith technicians as employees, filling out W-2 forms for them, or paying any payroll taxes on their income.

28. It was further part of the conspiracy that, in cases of price disputes with customers, the defendants prevented the police from being called, in order to avoid the detection and apprehension of the illegal alien technicians.

29. It was further part of the conspiracy that the defendant, Adam Olivkovich, reassigned technician Y.A., who was illegally residing in the United States and working without authorization, from North Carolina to Kansas, to prevent the detection of Y.A.'s illegal status.

30. It was further part of the conspiracy that the defendants prevented the dispatch of illegal technicians to locksmith jobs on military bases, because military bases would require the technician to show identification, which would result in the detection and apprehension of the illegal alien technicians.

31. It was further part of the conspiracy that the defendants recruited, hired, employed, and harbored the illegal and unauthorized aliens for the purpose of commercial advantage and private financial gain, in order to garner millions of dollars of illegal proceeds from their scheme and artifice to defraud customers of locksmith services, using the labor of illegal aliens.

### B. Overt Acts.

32. In furtherance of this conspiracy and to effect the ends thereof, the defendants and their co-conspirators committed and caused to be committed numerous overt acts in the Eastern District of Missouri and elsewhere, including but not limited to the following:

A. On or about February 22, 2008, in the Eastern District of Missouri, the defendants knowingly and recklessly caused co-conspirator Y.S., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer for pay, when he was illegally residing in the United States and unauthorized to work as a locksmith technician.

B. On or about June 26, 2008, in the Eastern District of Missouri, the defendants knowingly and recklessly caused co-conspirator Y.S., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer for pay, when he was illegally residing in the United States and unauthorized to work as a locksmith technician.

C. On or about February 24, 2009, in the Eastern District of Missouri, the defendants knowingly and recklessly caused co-conspirator E.B., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer for pay, when he was illegally residing in the United States and unauthorized to work as a locksmith technician.

D. On or about April 6, 2009, in the Eastern District of Missouri, the defendants knowingly and recklessly caused co-conspirator E.B., a locksmith technician employed by Dependable Locks, to provide locksmith services to a customer for pay, when he was illegally residing in the United States and unauthorized to work as a locksmith technician.

All in violation Title 8, United States Code, Section 1324(a)(1)(A)(v)(I), and punishable under Title 8, United States Code, Section 1324(a)(1)(B)(i).

## COUNT VIII
**Employment of Unauthorized Aliens**

The Grand Jury further charges that:

33. Paragraphs 1 through 32 of this Indictment are realleged and incorporated by reference herein.

34. Between on or about January 31, 2006, and November 4, 2009, in the Eastern District of Missouri, and elsewhere,

**DAVID PEER,
ADAM OLIVKOVICH, and
MOSHE AHARONI,**

Defendants herein, did hire and cause to be hired for employment aliens, knowing said aliens were unauthorized with respect to such employment, and, after hiring the aliens for employment, did continue to employ and cause to be employed said aliens in the United States knowing the aliens were or had become unauthorized with respect to such employment; and did engage in a pattern and practice of such violations.

In violation of Title 8, United States Code, Section 1324a(a)(1)(A) and (a)(2), and Title 18, United States Code, Section 2; and punishable under Title 8, United States Code, Section 1324a(f)(1).

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

35. Pursuant to Title 18, United States Code, Sections 981(a) and 982(a)(2) and Title 28, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Sections 1341 or 1343, or a conspiracy to commit such offense as set forth in Counts I through VI, the defendants shall forfeit to the United States any property, real or personal, constituting or derived from any proceeds traceable to said offense.

36. Pursuant to Title 18, United States Code, Section 982(a)(6), upon conviction of an offense in violation of Title 8, United States Code, Section 1324a or a conspiracy to commit an offense in violation of Title 8, United States Code, Section 1324 as set forth in Counts VII and VIII, the defendants shall forfeit to the United States any property, real or personal, that constitutes or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense, and any property, real or personal, used to facilitate or intended to be used to facilitate the commission of the offense.

37. Pursuant to Title 8, United States Code, Section 1324(b) and 28 United States Code, Section 2461(c), upon conviction of a conspiracy to commit an offense in violation of Title 8, United States Code, Section 1324(a) as set forth in Count VII, any conveyance, including any vessel, vehicle, or aircraft that has been or is being used in the commission of said violation, the gross proceeds of the violation, and any property traceable to such conveyance or proceeds shall be subject to forfeiture.

38. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offenses.

39. Specific property subject to forfeiture includes, but is not limited to, the following:

    a. $124,953.92 in United States currency;

    b. $11,592.00 in United States currency;

    c. $11,484.90 in United States currency;

    d. $885.00 in Canadian currency; and

e. certain money orders as described below:

| Issuer | Date Issued | Serial Number | Amount |
|---|---|---|---|
| USPS | 11/2/2009 | 1703740809 | $42.00 |
| USPS | 11/2/2009 | 1661479841 | $500.00 |
| USPS | 11/2/2009 | 1697595486 | $171.56 |
| USPS | 11/3/2009 | 1717704506 | $738.65 |
| USPS | 11/3/2009 | 1733287251 | $216.00 |
| USPS | 11/3/2009 | 1739158645 | $49.00 |
| USPS | 11/3/2009 | 1755518956 | $49.00 |
| MoneyGram | 11/3/2009 | 68651596970 | $500.00 |
| MoneyGram | 11/3/2009 | 68651596981 | $500.00 |
| MoneyGram | 11/3/2009 | 68651596992 | $152.94 |
| Chase | 11/3/2009 | 9780000400 | $416.11 |

40. If any of the property described above, as a result of any act or omission of the defendants:

 a. cannot be located upon the exercise of due diligence;

 b. has been transferred or sold to, or deposited with, a third party;

 c. has been placed beyond the jurisdiction of the court;

 d. has been substantially diminished in value; or

 e. has been commingled with other property which cannot be divided without difficulty,

the United States will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____
FOREPERSON

RICHARD G. CALLAHAN
United States Attorney

_____
D. JOHN SAUER, #2594570
Assistant United States Attorney

16