UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  S1-4:10CR255 CDP |
| | ) | |
| DAVID PEER and | ) | |
| MOSHE AHARONI, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM,**
**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Presently pending before the court are defendants David Peer's and Moshe Aharoni's Motions To Dismiss (the pending indictment) Based On The Government's Sending Alien Witnesses With Material Evidence Out Of The Country . . ., Or Alternatively, Motion To Compel Further Discovery Related To The Deported Witnesses (Docket Nos. 201 and 209).  All pretrial motions were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C.  § 636(b).

In these motions the defendants allege that the government deported, or otherwise caused to leave the United States, a number of persons who were and are potential witnesses at the trial of this case, and who could give testimony and evidence favorable to the defendants.  The defendants allege that the government removed or caused these persons to be removed from the country without notice to the defendants and before the defendants

had the opportunity to obtain their testimony.  The defendants further assert that because these persons are no longer in this country they are no longer available to be called as witnesses at the trial of this case.

**THE INDICTMENT**

The superseding indictment pending in this cause charges defendant David Peer with the offenses of Conspiracy To Commit Mail And Wire Fraud (Count 1); Mail Fraud (Counts 2-6); Conspiracy To Harbor Illegal Aliens (Count 7); and Employment Of Unauthorized Aliens (Count 8).  Defendant Moshe Aharoni is charged with the offenses alleged in Counts 1, 7, and 8).  He is not charged in Counts 2-6.

As background to the charges the indictment first alleges that:

1.    Dependable Locks, Inc., ("Dependable Locks") was a New York corporation headquartered at 407 South Arcturas, Clearwater, Florida.  Dependable Locks was owned and operated by defendants David Peer, Adam Olivkovich, and others.

2.    Y.Y. Call Center, LLC, ("Y.Y. Call Center") was a business entity operating from 407 South Arcturas, Clearwater, Florida.  Y.Y. Call Center was owned and operated by defendants David Peer, Adam Olivkovich, and others.

3.    Defendant David Peer held himself out as President of Dependable Locks and directed the call center and dispatch

- 2 -

operations of Dependable Locks and Y.Y. Call Center from the location at 407 South Arcturas in Clearwater, Florida.

4.   Defendant Adam Olivkovich managed and directed locksmith technicians operating throughout the United States, including in the Eastern District of Missouri.  These locksmith technicians were employed and dispatched by Dependable Locks, under the direction of David Peer and others.

5.   Defendant Moshe Aharoni was employed as a dispatch supervisor by Dependable Locks and Y.Y. Call Center at the 407 South Arcturas location in Clearwater, Florida.  He operated under the supervision of defendant David Peer.

6.   Beginning on or about January 31, 2006, and continuing to on or about November 4, 2009, defendants David Peer, Adam Olivkovich, Moshe Aharoni, and others known and unknown, operating through the entities Dependable Locks and Y.Y. Call Center, operated a locksmith business that included both a call center and a nationwide network of locksmith technicians who responded to emergency lockout requests, typically from consumers who had accidentally locked themselves out of a residence or automobile.

7.   The defendants employed dozens of locksmith technicians, who operated under the defendants' direction and control in major metropolitan centers throughout the United States.  The defendants employed locksmith technicians operating in the State of Missouri, including the Eastern District of Missouri.

8.    The defendants maintained a full-time staff of telephone operators and locksmith dispatchers, on duty 24 hours per day, who operated from 407 South Arcturas, Clearwater, Florida, under the management and control of defendant David Peer and others.

9.    The call center operators received phone calls, which were electronically forwarded to the call center at 407 South Arcturas, Clearwater, Florida, from a large number of telephone numbers listed nationwide for emergency locksmith services.  The operators received the calls and the defendants' locksmith business dispatched a locksmith technician from the area of each call to respond.

10. Unindicted co-conspirators E.B., Y.S., and Y.A. were locksmith technicians employed by defendants David Peer and Adam Olivkovich, through Dependable Locks, in the State of Missouri at various times between 2006 and 2009.  E.B. and Y.S. provided locksmith services under the direction and control of the defendants in the Eastern District of Missouri.  At certain times that they worked as locksmith technicians for Dependable Locks, E.B., Y.S., and Y.A. were aliens who were residing illegally in the United States and were unauthorized to work as locksmith technicians in the United States.

In Count 1 of the indictment it is alleged that the defendants conspired to carry out a scheme to defraud which they had devised through the use of the mails and interstate commercial

carriers and through wire communications.  The nature of the scheme to defraud and the manner in which it was carried out is further alleged in the indictment as follows:

12.  It was part of the conspiracy that defendants David Peer, Adam Olivkovich, Moshe Aharoni, and others known and unknown, knowingly and intentionally devised and implemented a scheme and artifice to defraud customers of locksmith services, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises.  Among other things, this scheme and artifice included fraudulent and deceptive advertising practices, designed to procure locksmith-service business from customers under false and misleading pretenses.  It also included fraudulent and deceptive price-quoting practices, designed to mislead customers of locksmith services about the prices charged by the locksmith technicians.  At various times during the life of the conspiracy, this scheme and artifice to defraud included but was not limited to the following elements:

a.  It was part of this scheme and artifice that the defendants' locksmith business operated under numerous fictitious business names across the United States, including in the State of Missouri and the Eastern District of Missouri.  These fictitious business names were advertised and listed in various media and directories, such as Yellow Pages, Yellowbook, and the internet.

- 5 -

b.   It was further part of this scheme and artifice that certain fictitious business names for the defendants' locksmith business were advertised in media and listed in phone directories with local phone numbers.   Certain advertisements and directory listings also contained false and fraudulent local business addresses for the defendants' locksmith business. These addresses were real local addresses, but they were in fact the addresses of other local business or residential properties with no affiliation with the defendants.   Said advertisements and listings were designed to deceive locksmith customers who responded to them into believing that they were contacting a local business.

c. It was further part of this scheme and artifice that the local phone numbers in the advertisements and directory listings for the defendants' locksmith business were routed automatically to the call center at 407 South Arcturas in Clearwater, Florida, by interstate wire transmission.

d.   It was further part of this scheme and artifice that operators at the Florida call center were trained and instructed to answer the phone using a fictitious local business name that falsely identified the company to the customer as a local business.

e.   It was further part of this scheme and artifice that, for emergency lockout customers, the operators were trained to avoid giving a price quote to the customer.  Consistent with their training, the operators typically provided three differently

phrased reasons to refuse to give pricing information, in lieu of giving a price quote.

f.  It was further part of this scheme and artifice that, if a customer insisted three times on receiving a price estimate, operators were trained to state that the price for a lockout would be a "$39 service fee, plus $15 and up to open the door."  This price quote was deliberately crafted by the defendants to mislead customers into expecting that they would be charged only $54. Operators were instructed to avoid revealing the maximum price for emergency lockout services, which was, at various times, $149 or $179.

g.  It was further part of this scheme and artifice that certain customers were not told the phrase "and up" at all, but were quoted a fixed service fee, or a fixed fee for service and opening, and were then charged more than the quoted price by the responding locksmith.

h.  It was further part of this scheme and artifice that the price quote of $54 was fraudulently designed by David Peer and others to be realistic yet slightly below market rates for emergency lockout services, so as to mislead customers into believing that they would be charged a competitive price for emergency lockout services.

i.  It was further part of this scheme and artifice that the actual price charged for lockout services was seldom $54.

- 7 -

Rather, the defendants and their agents trained, encouraged, and pressured the locksmith technicians to charge prices above $54 for emergency lockouts, up to $149 or $179, regardless of the services required to open the customer's lock.

j.   It was further part of this scheme and artifice that operators and locksmith technicians were instructed to make, and commonly did make, fraudulent representations about the expected response time of the locksmith technicians.

k.   It was further part of this scheme and artifice that operators were instructed to tell and generally did tell customers that their technicians were "professionally trained, certified, licensed locksmiths," when in fact, as defendants knew, many of their technicians had only cursory locksmith training, and many technicians were illegal aliens without authorization to work in the United States.

l.   It was further part of this scheme and artifice that, in the case of price disputes with customers, Dependable Locks technicians were instructed to engage, and often did engage, in coercive pressure tactics to procure payment from customers.  For example, on certain occasions, locksmith technicians withheld identification from customers who refused to pay, threatened to call the police and have customers arrested for "theft of services," threatened to lock customers' keys back in the car or home, and followed customers to ATMs to ensure cash payment.

m.  It was further part of this scheme and artifice that, on certain occasions, locksmith technicians were encouraged to drill locks unnecessarily and destroy them, so that the defendants and others could profit from charges for replacement locks.

n.  It was further part of this scheme and artifice that the defendants collected millions of dollars in fraudulently induced charges from customers of their locksmith services.

o.  It was further part of this scheme and artifice that locksmith technicians split the proceeds of the locksmith jobs with Dependable Locks.  The defendants caused their locksmiths to send weekly shipments of receipts, cash, and checks by the U.S. Postal Service and interstate commercial carrier, from locations outside Florida to 407 South Arcturas, Clearwater, Florida.

13.  It was further part of the conspiracy that the defendants knowingly caused numerous interstate wire communications, including telephone calls and email communications, and knowingly caused the interstate shipment of numerous parcels by the United States Postal Service and interstate commercial carrier, to further their scheme to defraud.

14.  It was further part of the conspiracy that David Peer, Adam Olivkovich, Moshe Aharoni, and others known and unknown, implemented the aforesaid scheme and artifice to defraud by engaging in a pattern and practice of hiring aliens who were

- 9 -

unauthorized to work in the United States, to serve as locksmith technicians.

15.  It was further part of the conspiracy that the defendants took steps to conceal the illegal alien status of their locksmith technicians, including but not limited to: failing to collect Employment Eligibility Verification Forms ("I-9") from technicians, falsely claiming that technicians were "independent contractors" to avoid reporting them as employees, moving or reassigning a technician to avoid immigration problems, preventing the actual calling of police in cases of price disputes, and refusing to dispatch illegal technicians to military bases.

In Counts 2-6 of the indictment defendant David Peer is alleged to have caused certain parcels to be delivered through the mails in furtherance of the scheme to defraud alleged in the indictment.

In Count 7 of the indictment it is alleged that the defendants conspired to conceal, harbor and shield from detection aliens who had entered and remained in the United States and that the defendants did so for commercial advantage and private financial gain.  The manner in which the defendant carried out this alleged conspiracy is described in the indictment as follows:

21.  It was part of this conspiracy that the defendants David Peer, Adam Olivkovich, and others recruited, hired, and employed as

locksmith technicians, numerous aliens who were illegally residing in the United States and unauthorized to work in the United States.

22.  It was further part of the conspiracy that the defendants David Peer, Adam Olivkovich, Moshe Aharoni, and others knew and recklessly disregarded the illegal and unauthorized status of the aliens employed by them and under their direction.

23.  It was further part of the conspiracy that the defendants collected forms from the locksmith technicians requiring them to report their visa status, which alerted the defendants to  the illegal and unauthorized status of the technicians.

24.  It was further part of the conspiracy that the defendants failed to collect, or retain for inspection by authorized government officials, Employment Eligibility Verification ("I-9") Forms from the locksmith technicians employed by them.

25.  It was further part of the conspiracy that the defendants harbored the illegal and unauthorized alien technicians by providing them with employment and income, allowing them the means to remain illegally in the United States.

26.  It was further part of the conspiracy that the defendants dispatched the illegal and unauthorized alien technicians to locksmith jobs throughout the United States, in order to profit from the labor of the illegally employed technicians.

27.  It was further part of the conspiracy that the defendants concealed the illegal status of the technicians by arranging to pay

the technicians through the direct splitting of cash and check proceeds from locksmith jobs, which enabled them to avoid reporting the locksmith technicians as employees, filling out W-2 forms for them, or paying any payroll taxes on their income.

28.   It was further part of the conspiracy that, in cases of price disputes with customers, the defendants prevented the police from being called, in order to avoid the detection and apprehension of the illegal alien technicians.

29.   It was further part of the conspiracy that the defendant, Adam Olivkovich, reassigned technician Y.A., who was illegally residing in the United States and working without authorization, from North Carolina to Kansas, to prevent the detection of Y.A.'s illegal status.

30.   It was further part of the conspiracy that the defendants prevented the dispatch of illegal technicians to locksmith jobs on military bases, because military bases would require the technician to show identification, which would result in the detection and apprehension of the illegal alien technicians.

31.   It was further part of the conspiracy that the defendants recruited, hired, employed, and harbored the illegal and unauthorized aliens for the purpose of commercial advantage and private financial gain, in order to garner millions of dollars of illegal proceeds from their scheme and artifice to defraud customers of locksmith services, using the labor of illegal aliens.

Lastly in Count 8 of the indictment it is alleged that the defendants hired and caused to be hired and employed aliens who were unauthorized to be so hired and employed.

## THE DEFENSE TO THE CHARGES IN THE INDICTMENT

The defendants vigorously dispute the allegations in the indictment.  In their motions the defendants set out and describe their defense to the various charges in the indictment.  As to the charges relating to fraud they assert the following in their motions:

Contrary to the Government's allegation that Defendants instructed their operators to intentionally misrepresent the price of the locksmith services, Defendants' version of the facts are that after David Peer took over the operation of Dependable Locks, significant changes were made to avoid misrepresenting information to prospective customers.  As is reflected in training materials produced in discovery, operators were told, "**Always be honest and truthful with the customer** . . . ." *See* Operating Procedures, attached as Exhibit 2 (emphasis added).

The defense theory is that the evidence will show that operators were first and foremost instructed to not to give a price at all to consumers. Importantly, under the Defendants' apprehension of the facts, the reason to avoid giving a price was for a very legitimate and non-fraudulent reason, *i.e.*, the locksmiths were the ones who needed to see the customer's situation

- 13 -

and assess how much it would cost to provide the locksmith services.  . . .  There are a collection of records produced in discovery which show that not only were operators instructed to avoid giving a price over the phone, but they were instructed to avoid doing so specifically because the locksmiths needed to assess the situation.  For instance, one document clearly states:

> Giving prices over the phone is tricky business. We are not trying to avoid prices, we would love to give every customer a set price and have the deal set in stone on every order but it is impossible. Often times we are not equipped to give a price over the phone as we cannot see the customers' problems through the phone.

*See* SW00012370-71, attached as Exhibit 3.  Another document within the training materials contains the following instruction:

> Never suggest or imply that the locksmith will give a price over the phone. This is poor salesmanship and is cheating.  The technician is a professional and he has to be on site to evaluate and give a price.  We have to schedule our jobs based on true salesmanship, **we are not tricking the customer into scheduling a job**.

*See* SW000012376-77, attached as Exhibit 4 (emphasis added).  And, a PowerPoint training presentation made to employees at the YY call center includes the following instructions:

> ·It is very important to avoid the price over the phone because it is unprofessional to provide a price without knowing all the facts before.
> ·Giving prices before the technician sees the actual job may cause us to lose money, upset the customer, or upset the technician.
> ·If we promise to do a job for a specific price without having a professional technician evaluate it first, you create many possibilities for misunderstandings.

- 14 -

*See* PowerPoint, attached as Exhibit 5.

. . .

[I]t will be part of the Defendants' theory of the case to show that locksmiths did believe that it was their job to make an assessment of the situation to determine at what price the lockout could be performed.  Live testimony is indisputably the best method of such proof.

The defendants' apprehension of the facts is also that if a customer is insistent on being told a price, operators were trained to only give an estimate – again because the locksmith needed to assess the situation before a set price could be determined. "If we promise to do a job for a specific price without having a professional technician evaluate it first, you create many possibilities for misunderstandings." *See* Ex. 4. In fact, the estimate was merely a minimum estimate with a clear indication that it could be more. Again there are many records which support this version of the facts. Written instructions given to Dependable Locks' operators state such things as "If any pricing is given for a lockout **it must be 39, 15 and up**.  Never just the service fee, never just the lockout fee.  If you have to say a range you can say 39, 15-141." *See* Ex. 4 (emphasis added), or "Never tell the customers it is a $54 minimum. **Stick to the guidelines, $39 svc fee, $15 and up to open the door**." *See id*.(emphasis added).  . . . [T]he Dependable Locks database will also show that for the vast

- 15 -

majority of customer calls, either no price was given or a minimum estimate with "and up" was given.  This coincides with the training materials which all first instruct the operator to avoid giving a price, and then if the customer insists each and every training document that discusses providing prices instructs the operators to include the phrase "and up."

In Paragraph 13.g. of the Indictment, the Government alleges that the minimum estimate given when a customer insisted on being told a price "was deliberately crafted by the defendants to mislead customers into expecting that they would be charged $54." *Id*. In other words, the Government claims providing a minimum estimate was still fraudulent because it was intended to fool people into thinking the "and up" meant nothing.

As presented immediately above, Defendants' understanding of the facts, which is supported by training materials, is that there was an emphasis to the operators that to have a customer think they are getting a set price was exactly what the Defendants did not want.  When customers insisted on a price, the training materials make clear that operators were instructed not to give a set price.  This documentation shows that every effort was made to have operators not give set prices, and that giving a set price was viewed as bad for the business.  Testimony that the intention was for customers to be given estimates and not set prices is therefore both material and favorable to defending this allegation.

- 16 -

. . .

[O]f importance to Defendants' defense is demonstrating that $54 was an acceptable charge, and that Defendants' had an intention and expectation that some customers would be charged only $54. Likewise, it is important to Defendants' position to show that the minimum estimate had a true basis in fact and was not fraudulent or criminally deceptive.

. . .

Additionally, Defendants maintain that it was the company policy, instituted when David Peer took over the company and contained in documents (*see* Customer Service Help Manuel (*sic*), p. 4, attached as Exhibit 9) that locksmiths provide a written explanation of services and charges before providing services. This policy was also explained to the operators, as is seen in training materials where proposed explanations were provided to operators:

1.   What I do is I get all your information and dispatch the closest technician. **He will give you a total price on site before he touches anything.**

2.   It is always better if the technician, who is the professional, gives you a total. I would hate to give you incorrect answers to question's I don't truly know the answers for.

3.   The tech will work within your budget and come to a reasonable price upon evaluating the situation.

4.   We cannot accurately examine what you need through the phone, but the tech will be able

- 17 -

to evaluate on site **and give you a total price before he does anything**.

5.  I'm not sure what the price is. My job is to get all your information and verify that it is accurate. We then dispatch the closest technician to you immediately. **He would be happy to go over pricing with you before he provides any service.**

6.  I'm not qualified to give total prices, the locksmith himself, who is the professional, **will give you a price on site before he does anything at all.**

*See* SW00028560-62, attached as Exhibit 10 (emphasis added).

This evidence undercuts the claim that telling a customer that the locksmith will be in a better position to determine the total cost is somehow "false and fraudulent." But, it is stronger and much more compelling if locksmiths can testify about application of the policy. And the testimony is necessary to refute the Government's claim that the documents do not mean what they say.

Defendant Aharoni asserts that he rarely had contact with customers, but instead was charged with dispatching locksmith technicians in the field to respond to service calls that had been booked by operators. The calls he would have been dispatching to locksmiths were ones that had been entered into the system by operators who had received the training discussed herein.

As to the charges set out in Counts 7 and 8 of the indictment each of the defendants claim in their motions that they

- 18 -

had nothing at all to do with the hiring of locksmiths and thus no knowledge of their immigration status.  They claim that testimony of the locksmiths who the government deported or caused to leave the country would support their claims.

## THE DEPORTED WITNESSES[1]

The defendants claim that four named locksmiths in particular were deported or caused to leave the country by the government who have testimony and evidence favorable to the defendants.  Those named persons are Matan Olivkovich, Asaf Aharon, Alon Abraham, and Ofer Yosefof.

In their motions the defendants set out the favorable testimony which they believe each of these witnesses would give in the defendants' defense of the charges, with citations to various documents upon which the assertions are based.  The information is summarized below as to each witness.

Matan Olivkovich[2]

Olivkovich has testified before the grand jury that he notified customers of the amount they would be charged before

---

[1]It is not disputed that the four witnesses listed below have left the country, either because they were deported, or because they were permitted voluntary departure.  The distinction is of no import to the analysis of the issues raised in the defendants' motions.  See United States v. Lin, 143 F. Supp. 2nd 783, 785 n.1 (E.D.Ky. 2001).

[2]In documents filed with the court Matan Olivkovich is identified as the brother of defendant Adam Olivkovich.

- 19 -

starting a job and that he used a Dependable Locks waiver form to so advise his customers.  The defendants assert that this testimony would be favorable "because it shows a lack of intent to defraud and shows that the company was attempting to ensure the customer knew what to expect."

Olivkovich in interviews with Immigration and Customs Enforcement (ICE) officers and with Postal Inspectors and Assistant United States Attorneys has stated that "Dependable Locks Inc. and affiliate names had poor business practices in the past and would overcharge customers for locksmith services but those practices have changed" (See Exhibit 11 to Defendants' Motions).  Olivkovich also stated that after David Peer purchased Superb Solutions, the predecessor company to Dependable Locks, that many rules changed. (See Exhibit 12 to Defendants' Motions).  The defendants' claim that this evidence supports the defense that "David Peer changed the company practice of overcharging customers."

Olikovich also told government investigators that while employed for Superb Solutions "he and other locksmith technicians would routinely drill each lock even though they had the ability to pick the lock because it would result in more money for the technician."  He went on to say that the locksmiths were doing so on their own and were not pressured to do so by their employer. (See Exhibit 12 to Defendants' Motions).  The defendants assert that this testimony directly refutes the allegations set out in

Paragraph 12(m) of the superseding indictment which alleges that it
was part of the scheme and artifice to defraud that "on certain
occasions, locksmith technicians were encouraged to drill locks
unnecessarily and destroy them, so that the defendants and others
could profit from charges for replacement locks."

The defendants assert that based on a review of records
relating to Olivkovich's service calls that he could also give
testimony that customers were charged amounts for services which
were consistent with prices that were quoted to them by
representatives of Dependable Locks.

Asaf Aharon

The defendants note that Aharon told investigators that
"locksmith prices vary depending on the type of service." (See
Exhibit 13 to Defendants' Motions).  The defendants assert that
such testimony would directly refute the allegations made in
Paragraph 12(i) of the superseding indictment that as a part of the
scheme and artifice to defraud locksmiths were told to charge
certain prices "regardless of the services required to open the
customer's lock."

The defendants also note that Aharon told investigators
that the charge for services could not be determined until the
locksmith arrived on the scene.  (See Exhibit 13 to Defendants'
Motions).  The defendants assert that such testimony would support

their position that representatives of Dependable Locks gave only estimates of prices to be charged.

The defendants also assert that a review of records of Aharon's service calls shows that on numerous occasions he charged amounts consistent with prices quoted to customers by representatives of Dependable Locks.

The defendants note that Aharon told investigators that no customer ever complained about his work and that refunds were offered if any damage was done by a technician.  (See Exhibit 13 to Defendants' Motions).  The defendants' claim that such testimony would be favorable "as a reflection of a well-intentioned business."

Alon Abraham

The defendants contend that the answers that Abraham gave to questions asked by investigators who interviewed him supports their defense that neither David Peer or Moshe Aharoni had anything to do with the hiring or training of locksmiths.  (See Exhibit 14 to Defendants' Motions).

The defendants also note that a review of records of Abraham's service calls during the period when he worked for Dependable Locks shows that on numerous occasions he charged amounts consistent with prices quoted to customers by representatives of Dependable Locks.

Ofer Yosefof

The defendants claim that review of records of service calls made by Yosefof shows that even though he worked for Dependable Locks for only a short time, on numerous occasions he charged amounts consistent with prices quoted to customers by representatives of Dependable Locks.

The defendants also argue that subsequent disclosures made by the government strengthen and add to their claims that witnesses Olivkovich and Aharon have favorable testimony to provide supporting the defendants' defense.  (See Docket Nos. 269 and 272).

## Discussion

In United States v. Valenzuela-Bernal, 458 U.S. 940 (1982) the Supreme Court had the occasion to discuss the conflict between the Executive Branch of government's power and duty to enforce immigration laws enacted by the Congress and the Sixth Amendment of the Constitution's guarantee to a defendant in a criminal case the right to "compulsory process for obtaining witnesses in his favor." United States Constitution, Amendment VI. The Court held that "[T]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal alien witnesses upon the Executive's good faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." U.S. v. Valezuela-Bernal, 458 U.S. at 872 (emphasis added).  When

a defendant makes a claim of a Sixth Amendment violation as a result of the deportation of witnesses "He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." Id. at 867.  The court recognized that the requirement that the defendant show the materiality of information possessed by a deported witness might be difficult particularly where neither the defendant or his attorney had the opportunity to interview the witness prior to his deportation.  The Court noted that this fact might "well support a relaxation of the specificity required in the showing on materiality." Id. at 870.  The Court said that "in such circumstances it is of course not possible to make any avowal of how a witness may testify.  But the events to which a witness might testify, and the relevance of those events to the crime charged may well demonstrate either the presence or absence of the required materiality." Id. at 871.  "A defendant cannot be expected to render a detailed description of their lost testimony." Id. at 873.  "Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." Id. at 873.

The undersigned concludes that the defendants have met their burden of making a plausible showing that the deported

- 24 -

witnesses have information and testimony which would have been both material and favorable to their defense.  The information and testimony of the witnesses as set out above and in defendants' motions clearly support the defendants' defense to the charges set out in the indictment as outlined in detail above.

The government claims that the testimony and information possessed by the deported witnesses is neither material or favorable to the defendants.  The government's position is based on a parsimonious and narrow reading of the witnesses' testimony.  The government points to other evidence which would tend to refute the testimony of the witnesses and which supports the government's theory of the case.  This is beside the point.  The credibility of witnesses and the weight to be afforded evidence are matters to be decided by a jury and are not relevant considerations on the issues before the court in defendants' motions.  See United States v. Leal-Del Carmen, 697 F.3d 964, 972 (9th Cir. 2012).

Nor is there any evidence before the court which would show that the testimony of the witnesses is cumulative to the testimony of other witnesses who are available to the defendant.  The government claims that the testimony of the witnesses is cumulative of other evidence available to the defendants, namely documents which have been provided in discovery and through the testimony of numerous other locksmiths employed by Dependable Locks.  The defendants point out that the information in the

documents, such as the waiver forms used by the locksmiths, do not in and of themselves explain how the forms were used. The defendants contend that the testimony of the witnesses is necessary to explain that the forms were used to provide the customers the price of services before they were done and that the documents, in and of themselves do not provide such information.  The point is well taken.  The government also claims that the information and testimony that the witnesses have been shown to have in their possession is available to the defendants through the testimony of other locksmiths employed by Dependable Locks.  However, as the defendants note, the government has not provided to them any statement of any witness who has provided the same information or testimony of the deported witnesses on these matters, and of course, the government would be required to disclose such statements by other witnesses to the defendants as favorable evidence.  Nor has any such testimony of other witnesses been presented to the Court by the government in support of its assertion that such evidence exists.  There simply has been no showing that the testimony of these witnesses is cumulative of other evidence available to the defendants.

Some courts have held that in addition to showing that a deported witness possessed material and favorable testimony, a defendant seeking sanctions must also show that the government acted in "bad faith" in deporting the witness(es).  See United

- 26 -

States v. Nebraska Beef, Ltd., 194 F. Supp. 2d 949, 957 (D.Neb. 2002), and cases cited therein.  The requirement that a defendant must show bad faith on the part of the government in deporting witnesses is derived from the Supreme Court's statement in Valenzuela-Bernal that the government is justified in the prompt deportation of illegal-alien witnesses "upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution."  458 U.S. at 872.  In determining whether the government acted in bad faith the court must look to what knowledge the government possessed when it acted to deport the witness(es).  Nebraska Beef, Ltd, 194 F. Supp. 2d at 957; United States v. Chaparro-Alcantra, 226 F.3d 616, 624 (7th Cir. 2000).  In this case, each of the four witnesses had been interviewed by government agents before their deportation.  (See Exhibit 11 to Defendants' Motions, Interview of Matan Olivkovich on November 4, 2009, by ICE agent; Exhibit 12 to Defendants' Motions, Interview of Matan Olivkovich by Postal Inspector on January 6, 2010; Exhibit 13 to Defendants' Motions, Interview of Asaf Aharon on November 4, 2009, by ICE agents; Exhibit 14 to Defendants' Motions, Interview of Alon Abraham on November 4, 2009, by ICE agents; Exhibit 15 to Defendants' Motions, Interview of Ofer Yosefof on November 4, 2009, by ICE agents.)  Two of the witnesses, Matan Olivkovich and Asaf Aharon later appeared before a federal grand jury in the Eastern District of Missouri, before being

deported, Aharon on November 18, 2009, and Olivkovich on January 6, 2010.

> When the government doesn't know what a witness
> will say, it doesn't act in bad faith by deporting
> him.  But if the government interviews the witness
> or has other information suggesting that he could
> offer exculpatory evidence, the government may not
> deport him without first giving defense counsel a
> chance to interview him.

United States v. Leal-Del Carmen, 697 F.3d 964, 970 (9th Cir. 2012).  It is clear, at least as to witnesses Matan Olivkovich and Asaf Aharon, that prior to their being deported the government was aware that they had information and testimony that contradicted and refuted at least some of the government's evidence and theory of the case.  In order "for evidence to be favorable and material, none of the cases require that it serve as a defense to every government allegation."  Nebraska Beef, Ltd, 194 F. Supp. 2d at 960.  Records of this court show that defendant Aharoni was taken into custody in this cause on November 4, 2009, on a warrant issued upon the filing of a complaint in this cause.  Defendant Peer was arrested the following day, November 5, 2009, on a warrant issued upon the complaint.  Thus, at the time Olivkovich and Aharon were deported, following their appearances before the grand jury, both defendants Peer and Aharoni were before the court and represented by counsel.  In Leal-Del Carmen, the Ninth Circuit held that,

> Once the government is aware that an alien has
> potentially exculpatory evidence, it must treat
> that person as a material witness and give defense
> counsel the opportunity to interview him and make a

reasoned determination whether to seek his retention pending trial. This means the witness may not be deported before defense counsel has been retained or appointed and has had a fair opportunity to interview him. If defense counsel advises the government that the witness may be useful to the defense, he may not be deported until defense counsel indicates he is no longer needed. If the government wants to deport the witness notwithstanding defense counsel's wishes, it must obtain permission from the district court on a showing of good cause, which defense counsel must have the opportunity to oppose; it must also afford defense counsel the opportunity to cross-examine the witness and preserve the testimony for trial.

697 F.3d at 970.

It is not disputed that both witnesses Matan Olivkovich and Asaf Aharon were brought before a federal grand jury sitting in the Eastern District of Missouri on warrants for their arrest as material witnesses in this cause. In spite of the fact that defendants Peer and Aharoni were both before the court with counsel the government made no effort to make them available for interview or deposition before deporting them. Nor is there any evidence before the court to show that counsel for defendants Peer and Aharoni were even informed that Olivkovich and Aharon were in custody and available for interview or deposition. This demonstrates bad faith on the part of the government. See also, United States v. Chaparro-Alcantara, 226 F.3d 616, 624-25 (7th Cir. 2000) (No bad faith when witnesses deported after interviewed by defense counsel and upon order of the court).

- 29 -

As to deported witnesses Alon Abraham and Ofer Yosefof, it may not have been readily apparent to agents who interviewed them that they had information and testimony that was material and favorable to the defendants. However, it appears that minimal effort was made by the interviewing agents to determine whether the witnesses had any such information. It appears that the agents who arrested and interviewed Abraham were provided with a list of 41 questions to ask of Abraham regarding his alien status and work as a locksmith. (See Exhibit 14 to Defendants' Motions). Abraham gave one word, or very brief, answers to all of the questions. It appears that the agents did not ask any follow-up questions to ferret out any details as to any of the answers given by the witness. Such perfunctory questioning can hardly be characterized as a good-faith effort to determine that the witness possessed no evidence favorable to the accused. The same can be said as to deported witness Ofer Yosefof. The sum and substance of the information obtained by agents who arrested and interviewed Yosefof is set out in their report as follows:

> YOSEFOF was read his Miranda rights and asked about Dependable Locks, Inc. YOSEFOF stated that he did not work directly for Dependable Locks, Inc. However, YOSEFOF admits that he received referrals from Dependable Locks, Inc. YOSEFOF claims to be self employed in the locksmith business. YOSEFOF stated that he had no knowledge or particulars about Dependable Locks, Inc.
>
> YOSEFOF stated that Ely Locksmith filed an I-140 in his behalf. Form I-485 (application for adjustment) was denied on September 1, 2009 by the

- 30 -

U.S. Citizenship and Immigration Services.  YOSEFOF failed to show for his interview and claims that he sent a letter to the U.S. CIS requesting re-scheduling of his interview.

Case Closed.

The government cannot claim that it acted in good faith when it makes a minimal effort to obtain information from a potential witness in a criminal case.  See Nebraska Beef, Ltd., 194 F. Supp. at 958.  (Bad faith shown where "agents wholly failed to follow the practice of faithfully searching for and preserving exculpatory evidence.")  The defendants have shown that the government did not make a "good faith" effort to determine whether the witnesses possessed no evidence favorable to the defendants in this case.

Because the defendants have made a plausible showing that the deported witnesses had testimony and information both material and favorable to their defense; that the testimony is not cumulative to other evidence or testimony available to the defendants; and that the government did not make a "good faith" effort to determine whether the witnesses possessed evidence favorable and material to the defendants before deporting the witnesses, the defendants' motions should be granted and the indictment should be dismissed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that defendants David Peer's and Moshe Aharoni's Motions To Dismiss (the pending indictment) Based On the Government's Sending Alien Witnesses Out Of The Country (Docket Nos. 201 and 209) should be granted.

**IT IS FURTHER RECOMMENDED** that defendants David Peer's and Moshe Aharoni's Alternative Motions To Compel Further Discovery Related To The Deported Witnesses (Docket Nos. 201 and 209) should be denied as moot.

The parties are advised that any written objections to these findings and determinations shall be filed not later than **February 14, 2013.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
_____
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of January, 2013.